**Mikco Steven BALL, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 1277S817.**

Supreme Court of Indiana.

April 16, 1981.
Rehearing Denied June 8, 1981.

Harriette Bailey Conn, Public Defender, David P. Freund, Marcia L. Dumond, Deputy Public Defenders, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Joel Schiff, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant Mikco Steven Ball was charged by information in Hamilton Circuit Court with three counts of first degree murder. Ind.Code § 35–13–4–1 (Burns 1975). The information alleged that Ball purposely and with premeditated mal-

ice killed Eugene Lillico, Rick Burke and Steven Nichter. After a change of venue to Jefferson County, appellant Ball pleaded not guilty to each count and was tried to a jury. The jury convicted Ball of second degree murder for each of the three killings. *See* Ind.Code § 35–1–54–1 (Burns 1975). The trial court subsequently sentenced him to three life terms. Ball raises four issues for our consideration on this appeal, concerning: (1) whether the trial court erred in allowing testimony from a clergyman; (2) whether the trial court erroneously admitted into evidence certain confessions given by Ball; (3) whether the trial court erred in giving final instruction number 28A to the jury; and (4) whether the evidence was sufficient to sustain the convictions.

### I.

Appellant Ball first argues the trial court improperly permitted testimony from a minister, Purvis Earl Lawson. The record reveals that Ball initiated a conversation with Reverend Lawson in which Ball admitted killing three people. Over defendant's objection, the trial court permitted the prosecutor to elicit this evidence from Lawson. On the basis of Ind.Code § 34–1–14–5 (Burns 1973), appellant challenges the pastor's competency to testify as to Ball's admissions.

The statute in question provides in part:
"The following persons shall be incompetent witnesses:

.      .      .      .      .

*Fifth.* Clergymen, as to confessions or admissions made to them in course of discipline enjoined by their respective churches."

The key question in this case concerns whether Lawson engaged in this conversation in the course of "discipline enjoined by" his church. Reverend Lawson testified that he is the pastor of the Southside Baptist Church in Indianapolis. He stated that he is not a graduate of any theological seminary, and that his church is not associated in any way with the Southern Baptist Convention. Lawson also stated that his church has a written constitution, but that this constitution is not made available to non-members.

The record reveals that Ball had attended Lawson's church for four or five months prior to the conversation in question; however, he was not a member of the church, and had not attended services for approximately eight weeks before contacting Lawson. Ball telephoned Lawson on Saturday, January 3, telling him he wished to speak with him the next day following the morning worship service. Lawson agreed, and when the service was concluded, he and Ball sat in the choir loft and talked. Ball told Lawson at that time that he had killed three people. Lawson testified that initially he did not believe Ball's story, but he also encouraged Ball to turn himself in to police if what he had said was true. Ball said he would think about it. The following day, Monday, Lawson related to Indianapolis Police Officer Arnold Nelson what Ball had said, although he did not mention Ball's name. Nelson said he was unaware of any missing persons or any unsolved multiple murders. Lawson and Ball talked by telephone again that night, and Lawson testified that he again urged Ball to turn himself in. The next day, Nelson and other police officers contacted Lawson and informed him of the disappearance of three men. Lawson testified that the circumstances related by police surrounding the disappearance of the men coincided with the details Ball had given him concerning the murders. That night, Lawson contacted Ball and eventually convinced him to turn himself over to the custody of Indianapolis police officers.

We hold Lawson was not an incompetent witness. He testified that pastoral confession does not constitute one of the tenets or disciplines of his church. He also testified that his church does not recognize a confidential pastor-parishioner relationship with respect to evidence of a crime. Lawson stated that if a person were to talk to him about a legal matter, he would tell them that he would not "stand up" for him

and would not keep the information confidential; instead, he said he would testify against someone if he learned from them that they had committed a crime. Lawson also stated that his status as a preacher would not affect his decision to testify against a person in that regard. Therefore, we conclude that Ball's admissions to Lawson were not made "in [the] course of discipline enjoined by" Lawson's church. §35–1–14–5, *supra; Knight v. Lee,* (1881) 80 Ind. 201, 203–04; *Buuck v. Kruckeberg,* (1950) 121 Ind.App. 262, 268, 95 N.E.2d 304, 306. The trial court did not err in admitting Lawson's testimony.

## II.

Appellant Ball next argues that the trial court erroneously failed to suppress incriminating statements Ball gave to police officers. He contends these statements were not given voluntarily and, therefore, should not have been admitted.

■ As we have stated many times, the admissibility of a confession is to be determined from an examination of the totality of the circumstances. On appeal, this Court will review the question of such admissibility as we do other sufficiency matters. We will determine only whether there was substantial probative evidence to support the trial court's findings. In making this determination, we will not reweigh the evidence nor judge the credibility of witnesses. *E. g., Lonson v. State,* (1980) Ind., 406 N.E.2d 256, 259; *Porter v. State,* (1979) Ind., 391 N.E.2d 801, 806; *Ray v. State,* (1979) Ind., 396 N.E.2d 373, 375; *Murphy v. State,* (1977) 267 Ind. 184, 191, 369 N.E.2d 411, 414.

In the case before us, the record reveals that Indianapolis Police Sergeant Jack Ohrberg met with Ball at around 11:00 p. m. on January 6, 1976, in the presence of Officer Nelson and Reverend Lawson after Lawson had persuaded Ball to turn himself in. Ohrberg testified at the hearing on Ball's motion to suppress that he orally advised Ball of his rights, but told Ball that he did not have any printed waiver forms on hand. Ball told Ohrberg that he understood his rights.

He then attempted to direct Ohrberg, Nelson, Lawson, and Officer Philip Gerdt to the location of the bodies. During the search, Ball made several incriminating statements in response to Ohrberg's questions regarding the location of the bodies. Nelson and Lawson substantially corroborated Ohrberg's testimony regarding this sequence of events.

After approximately three hours of fruitless searching, Ball was returned to the Indianapolis Police station. There, Ohrberg again advised Ball of his rights, and Ball signed a written waiver of rights form. Ball then gave a tape-recorded oral confession. When this statement was transcribed a few days later, Ball read and signed the transcription. The tape recording of the confession was admitted at trial and played for the jury. Ohrberg testified that Ball appeared nervous, but not under the influence of alcohol or other drugs. Ohrberg further stated that he did not coerce Ball into giving these statements, nor did he make any specific promises to Ball concerning treatment he might need or leniency.

Ball also made an oral confession during the search for the bodies. Indianapolis Police Officer Philip Gerdt testified that he and Ball talked about the killings while they were alone briefly in the car. Before the crimes were discussed, however, Gerdt orally advised Ball of his rights. Gerdt testified that Ball said he understood his rights and specifically stated that he did not want an attorney.

■ The evidence clearly reveals that Ball's confessions were given voluntarily. Ball was advised of his rights on each occasion before discussing or being questioned about the killings, and in either oral or written form, waived his rights each time. When given the opportunity to do so, Ball signed a waiver form, in which he acknowledged that he did not have to speak and further acknowledged that he had not been pressured or coerced into giving the statement. In light of all the testimony heard on this question, we believe there was sufficient evidence of probative value to support

a finding that the statements were not given involuntarily, and to justify the admission of these statements into evidence. *Cf. Brewer v. Williams*, (1976) 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424. There was conflicting testimony presented concerning alleged promises made to Ball, or other alleged inducements which prompted him to confess. Such conflicts were, of course, for the trial court to resolve. *Love v. State*, (1980) Ind., 400 N.E.2d 1371, 1372–73. *See Lonson v. State, supra; Ray v. State, supra; Richardson v. State*, (1978) 268 Ind. 61, 63, 373 N.E.2d 874, 875. *See also Gutierrez v. State*, (1979) Ind., 395 N.E.2d 218, 223–24; *Johnson v. State*, (1978) 269 Ind. 370, 378, 380 N.E.2d 1236, 1241.

### III.

Appellant Ball next argues the trial court erred in giving final instruction number 28A. This instruction provided:

"It is the law of Indiana that every person who shall aid or abet in the commission of a felony, or who shall counsel, encourage, hire, command, or otherwise procure a felony to be committed, may be charged by indictment or affidavit, and may be tried and convicted in the same manner as if he were a principal, either before or after the principal offender is charged, indicted or convicted; and upon such conviction, he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

Record at 227. Appellant acknowledges that this instruction correctly states the law. However, he claims the record is "entirely devoid" of evidence that Ball aided anyone in the commission of this crime. Therefore, he argues, this instruction served only to confuse the jury.

■ We find, however, that there was sufficient evidence to justify giving this instruction. A number of facts or circumstances of this case point to the involvement of another person. First, the three victims were killed, one after another, by a shotgun blast fired from a single load sixteen-gauge shotgun. However, the scene where the bodies were discovered gave no indication that a struggle had occurred. Second, while Ball only admitted carrying a sixteen-gauge shotgun, shotgun shells of a different gauge were also discovered in the field where the bodies were found. Third, Ball was arrested the night before these killings for an incident which occurred at the Deja Vu tavern. However, one of the co-owners of the Deja Vu subsequently supplied the money for Ball's bail that same night. Fourth, another co-owner of the Deja Vu testified that he had been granted immunity in exchange for his testimony before a Hamilton County grand jury concerning these matters. Finally, when one of Ball's friends, Edward Pettigrew, asked him if he had been involved in the disappearance of Lillico, Burke, and Nichter, Ball answered, "Yes and no." Neither Pettigrew nor Ball elaborated on the meaning of this remark. We think these facts justified the giving of an instruction on aiding and abetting. There is no error here.

### IV.

■ Finally, appellant Ball challenges the sufficiency of the evidence. This claim is based largely on his argument that his various confessions should not have been admitted into evidence. We held in Issue II, *supra*, that these confessions were properly admitted. Thus, the confessions were fully probative on the issue of Ball's guilt. *Baker v. State*, (1980) Ind., 400 N.E.2d 137, 138; *Robinson v. State*, (1979) Ind., 397 N.E.2d 956, 959; *Hudson v. State*, (1978) 268 Ind. 310, 313, 375 N.E.2d 195, 196.

The evidence revealed that appellant Ball was employed as a waiter at the Deja Vu tavern in Indianapolis. One of the victims, Rick Burke, had been employed at the tavern, and another victim, Gene Lillico, had been hired to replace Burke. On December 24, 1975, one of the co-owners of the Deja Vu, Donald Martinelli, fired Ball. On the following Saturday, December 27, Ball was arrested for disorderly conduct outside the Deja Vu. However, Martinelli subsequently arranged for Ball to be released on bail.

The next day, December 28, at approximately 7:30 p. m., Ball went to the apartment rented by Nichter and Burke. The three men put a television and a phonograph into Nichter's car and then went to Lillico's apartment. Ball was carrying a sixteen-gauge shotgun at this time. He had borrowed this gun from his neighbor a few hours earlier. When Nichter's brother went to the apartment later that evening, he discovered both doors standing open.

After picking up Lillico, the group went to the Deja Vu tavern, which was closed at the time. They gained entry through the use of Lillico's key. While inside the tavern, Lillico opened the safe and took approximately one thousand dollars from it. This money was given to Ball. The group then drank some liquor and attempted, unsuccessfully, to pry open the cigarette machine. They left the bar shortly thereafter.

Ball then drove the other three men north on Meridian Street in Nichter's car. In southern Hamilton County, Ball stopped the car and all four men got out of the car and walked into a nearby field. Ball then proceeded to shoot each of the victims. All three victims were shot once in the back or side of the head from close range. The bodies were ultimately discovered several hundred feet from the road. The expert testimony established that the victims were probably killed at the spot where their bodies were found.

When Ball returned to Nichter's car, he was unable to drive it out of the ditch where it was parked. Ball then walked to a nearby house and, with the owners' permission, called a tow truck for assistance. Ball had the car towed to downtown Indianapolis. He then returned to his home. Ball returned the shotgun to his neighbor on the following day.

In his taped confession, appellant Ball fully admitted carrying the shotgun and shooting the victims. By his own statements, the evidence clearly shows the killings were purposely done; this element is also supported by the fact that there were three victims, each killed by a shotgun blast inflicted at close range, each shot having come from the same gun. The requisite malice may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death. *Fryback v. State*, (1980) Ind., 400 N.E.2d 1128, 1131; *Faust v. State*, (1977) 266 Ind. 640, 642, 366 N.E.2d 175, 176. *See* Ind.Code § 35–1–54–1 (Burns 1975). Clearly, the evidence is sufficient to sustain the convictions.

Finding no reversible error, we affirm the judgment of the trial court.

GIVAN, C. J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.